# UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

> TRIGGER WARNING: THE FOLLOWING CONTACTS SEXUAL FACTS, VIDEOS and STATEMENTS that might trigger survivors of sexual assault

Civil Case No.: _____

COMPLAINT FEDERAL JURY TRIAL DEMAND

## SUPREME COURT OF THE STATE
## OF NEW YORK COUNT OF NEW YORK

JANE DOE

                    Plaintiff,

v.

**JAMES DOLAN**, **NEW YORK KNICKS**, **NATIONAL BASKETBALL ASSOCIATION**, **NATIONAL BASKETBALL PLAYERS ASSOCIATION**, **KEVIN GARNETT**, **RONALD GLEN "BIG BABY" DAVIS**, **MADISON SQUARE GARDEN SPORTS CORPORATION**, **MICHELE ROBERTS** of NBA Players Association, **STEVE MILLS of Knicks and MSQ Entertainment**, **BRITTANY STAMOULIS** as a PERSON and REPRESENTATIVE for MADISON SQUARE GARDEN SPORTS CORPORATION, **ALYSON FURCH** NEW YORK KNICKS, **GARDEN OF DREAMS FOUNDATION**, MADISON SQUARE GARDEN SPORTS CORPORATION, **IAN BEGLEY**, ESPN SPORTS, **DERRELL JOHNSON**, NEW YORK BEACON, **TINA CERVASIO**, SIRIUS XM and CBS SPORTS NETWORK, **CASEY POWELL** as a person and representative of KNICKS FAN TV and NBA SIRRIUS XM RADIO

-------X Plaintiff JANE DOE ("JANE DOE") hereby alleges, as and for her Complaint against Defendants as follows:

**PRELIMINARY STATEMENT** 1. WHILE ON DUTY in a professional capacity an NBA player did place his naked penis on JANE DOE in a sexually assaulting manner both intentionally with intent to sexually assault and harass the Plaintiff. The sexual actions were caught on video and recording. When Plaintiff complained to the team, the NBA Players Association, NBA league and to colleagues like Tina Cervasio and Ian Begley were aware of the situation and they chose to cover it up and were giving better access to sports stories and interviews. In addition, Plaintiff was terrorized for coming forward and faces extreme retaliation and more harassment including denials of media credentials and more.

Plaintiff Jane Doe expects to amend this complaint but filed it to not miss the deadlines for the NYCHRL, CPLR 214-j, Sexual Harassment, Gender Discrimination, Hostile Work Environment under New York City Human Rights Law, N.Y.C.  Amin. Code 8-101 et seq (NYCHRL) that Plaintiff suffered as sexual, physical and other injury as a direct result of conduct that constitute sexual offenses as defined in Article 130 of the New York Penal Law and such acts and/or omissions, cover up were committed against Defendants including Ian Begley and Tina Cervasio among others. Defendants' actions constitute aiding and abetting crimes and coverups Pursuant to 10-1105(a) and New York Penal Law. Amends forthcoming intentionally caused attention to be distracted away from the case to help the Defendants downplay what happened to Plaintiff Jane Doe. (Cassandra Ventura vs. Sean Combs et al).

Casey Powell did have knowledge of this but used the moment to gain stature with Ian Begley and the Knicks. He set out to divert the truth from being told to increase his changes of being part of the New York Knicks media, to support his chances of receiving additional support from Ian Begley and out of greed.

2

The relief sought is $50 million or an amount to be determined at trial, for inter alia physical injury, economic and compensatory damages, punitive damages, attorney's fees and costs, pain suffering, harassment, sexual assault and professional losses together with any such other and further relief as this Court deems just and proper

Venue is proper as a substantial part of the events and omissions giving rise to Plaintiff's claims too place in New York County. Plaintiff designates NEW YORK COUNTY as the place of trial by jury

Filed on November 24, 2023 in New York, NY

FILED in NEW YORK SUPREME COURT in NYC

500 Pearl St, New York, NY 10007 on November 24, 2023

_____

Respectfully submitted

by Plaintiff, Pro Se

(Address Withheld from Public)

See attachment

## SERVICE PAGE

As the attorneys in New York City expressed fear of retaliation about suing James Dolan Madison Square Garden Sports Corporation for fear of being banned from The Garden related events and owned properties, every attempt has been made to make sure the Defendants have been served via the corporate counsel(s) on record.

Service was sent to:
Mr. Jamaal Lesane
c/o **Madison Square Garden Sports Corp.**
Two Pennsylvania Plaza
New York, NY 10121

Eleanor "Nell" DeVane
**ESPN Communications**
ESPN Plaza
Bristol, CT 06010

**SportsNet - New York**
4 World Trade Center
150 Greenwich Street
New York, NY 10007

**CBS Sports Network**
General Counsel
51 West 52nd Street, 25th Floor
New York, NY 10019

**New York Post**
Legal Department
1211 Avenue of the Americas
New York, NY 10036

**New York Beacon Newspaper**
GENERAL COUNSEL
The New York Beacon
600 3rd Ave, New York, NY 10016

STATEMENT of CONFIDENTIALITY for FEAR of RETALIATION

FILED in NEW YORK SUPREME COURT in NYC

500 Pearl St, New York, NY 10007 on November 24, 2023

_____

Respectfully submitted
JANE DOE mailing address submitted to
CLERK of COURT by Plaintiff

**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------

| TRIGGER WARNING: THE FOLLOWING CONTACTS SEXUAL FACTS, VIDEOS and STATEMENTS that might trigger survivors of sexual assault |
| --- |

Civil Case No.: _____

COMPLAINT FEDERAL JURY TRIAL DEMAND

**SUPREME COURT OF THE STATE**
**OF NEW YORK COUNT OF NEW YORK**

JANE DOE

Plaintiff,

v.

**JAMES DOLAN**, **NEW YORK KNICKS**, **NATIONAL BASKETBALL ASSOCIATION**, **NATIONAL BASKETBALL PLAYERS ASSOCIATION**, **KEVIN GARNETT**, **RONALD GLEN "BIG BABY" DAVIS**, **MADISON SQUARE GARDEN SPORTS CORPORATION**, **MICHELE ROBERTS** of NBA Players Association, **STEVE MILLS of Knicks and MSQ Entertainment**, **BRITTANY STAMOULIS** as a PERSON and REPRESENTATIVE for MADISON SQUARE GARDEN SPORTS CORPORATION, **ALYSON FURCH** NEW YORK KNICKS, **GARDEN OF DREAMS FOUNDATION**, MADISON SQUARE GARDEN SPORTS CORPORATION, **IAN BEGLEY**, ESPN SPORTS, **DERRELL JOHNSON**, NEW YORK BEACON, **TINA  CERVASIO**, SIRIUS XM and CBS SPORTS NETWORK, **CASEY POWELL** as a person and representative of KNICKS FAN TV and NBA SIRRIUS XM RADIO

-------X Plaintiff JANE DOE ("JANE DOE") hereby alleges, as and for her Complaint against Defendants as follows:

**PRELIMINARY STATEMENT** 1. WHILE ON DUTY in a professional capacity an NBA player did place his naked penis on JANE DOE in a sexually assaulting manner both intentionally with intent to sexually assault and harass the Plaintiff. The sexual actions were caught on video and recording. When Plaintiff complained to the team, the NBA Players Association, NBA league and to colleagues like Tina Cervasio and Ian Begley were aware of the situation and they chose to cover it up and were giving better access to sports stories and interviews. In addition, Plaintiff was terrorized for coming forward and faces extreme retaliation and more harassment including denials of media credentials and more.

Plaintiff Jane Doe expects to amend this complaint but filed it to not miss the deadlines for the NYCHRL, CPLR 214-j, Sexual Harassment, Gender Discrimination, Hostile Work Environment under New York City Human Rights Law, N.Y.C. Amin. Code 8-101 et seq (NYCHRL) that Plaintiff suffered as sexual, physical and other injury as a direct result of conduct that constitute sexual offenses as defined in Article 130 of the New York Penal Law and such acts and/or omissions, cover up were committed against Defendants including Ian Begley and Tina Cervasio among others. Defendants' actions constitute aiding and abetting crimes and coverups Pursuant to 10-1105(a) and New York Penal Law. Amends forthcoming intentionally caused attention to be distracted away from the case to help the Defendants downplay what happened to Plaintiff Jane Doe. (Cassandra Ventura vs. Sean Combs et al).

Casey Powell did have knowledge of this but used the moment to gain stature with Ian Begley and the Knicks. He set out to divert the truth from being told to increase his changes of being part of the New York Knicks media, to support his chances of receiving additional support from Ian Begley and out of greed.

The relief sought is $50 million or an amount to be determined at trial, for inter alia physical injury, economic and compensatory damages, punitive damages, attorney's fees and costs, pain suffering, harassment, sexual assault and professional losses together with any such other and further relief as this Court deems just and proper

Venue is proper as a substantial part of the events and omissions giving rise to Plaintiff's claims too place in New York County. Plaintiff designates NEW YORK COUNTY as the place of trial by jury

Filed on November 24, 2023 in New York, NY

FILED in NEW YORK SUPREME COURT in NYC

500 Pearl St, New York, NY 10007 on November 24, 2023

Respectfully submitted

by Plaintiff, Pro Se

(Address Withheld from Public)

See attachment

3

## SERVICE PAGE

As the attorneys in New York City expressed fear of retaliation about suing James Dolan Madison Square Garden Sports Corporation for fear of being banned from The Garden related events and owned properties, every attempt has been made to make sure the Defendants have been served via the corporate counsel(s) on record.

Service was sent to:
Mr. Jamaal Lesane
c/o **Madison Square Garden Sports Corp.**
Two Pennsylvania Plaza
New York, NY 10121

Eleanor "Nell" DeVane
**ESPN Communications**
ESPN Plaza
Bristol, CT 06010

**SportsNet - New York**
4 World Trade Center
150 Greenwich Street
New York, NY 10007

**CBS Sports Network**
General Counsel
51 West 52nd Street, 25th Floor
New York, NY 10019

**New York Post**
Legal Department
1211 Avenue of the Americas
New York, NY 10036

**New York Beacon Newspaper**
GENERAL COUNSEL
The New York Beacon
600 3rd Ave, New York, NY 10016

STATEMENT of CONFIDENTIALITY for FEAR of RETALIATION

FILED in NEW YORK SUPREME COURT in NYC

500 Pearl St, New York, NY 10007 on November 24, 2023

_____

Respectfully submitted
JANE DOE mailing address submitted to
CLERK of COURT by Plaintiff

**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------

TRIGGER WARNING: THE FOLLOWING CONTACTS SEXUAL FACTS, VIDEOS and
STATEMENTS that might trigger survivors of sexual assault

Civil Case No.: _____

COMPLAINT FEDERAL JURY TRIAL DEMAND

**SUPREME COURT OF THE STATE
OF NEW YORK COUNT OF NEW YORK**

JANE DOE

                              Plaintiff,

v.

**JAMES DOLAN**, **NEW YORK KNICKS, NATIONAL BASKETBALL ASSOCIATION,
NATIONAL BASKETBALL PLAYERS ASSOCIATION, KEVIN GARNETT, RONALD
GLEN "BIG BABY" DAVIS, MADISON SQUARE GARDEN SPORTS
CORPORATION, MICHELE ROBERTS of NBA Players Association, STEVE MILLS
of Knicks and MSQ Entertainment, BRITTANY STAMOULIS** as a PERSON and
REPRESENTATIVE for MADISON SQUARE GARDEN SPORTS CORPORATION,
**ALYSON FURCH** NEW YORK KNICKS, **GARDEN OF DREAMS FOUNDATION**,
MADISON SQUARE GARDEN SPORTS CORPORATION, **IAN BEGLEY**, ESPN
SPORTS, **DERRELL JOHNSON**, NEW YORK BEACON, **TINA  CERVASIO**, SIRIUS
XM and CBS SPORTS NETWORK, **CASEY POWELL** as a person and representative
of KNICKS FAN TV and NBA SIRRIUS XM RADIO

-------X Plaintiff JANE DOE ("JANE DOE") hereby alleges, as and for her Complaint against Defendants as follows:

**PRELIMINARY STATEMENT** 1. WHILE ON DUTY in a professional capacity an NBA player did place his naked penis on JANE DOE in a sexually assaulting manner both intentionally with intent to sexually assault and harass the Plaintiff. The sexual actions were caught on video and recording. When Plaintiff complained to the team, the NBA Players Association, NBA league and to colleagues like Tina Cervasio and Ian Begley were aware of the situation and they chose to cover it up and were giving better access to sports stories and interviews. In addition, Plaintiff was terrorized for coming forward and faces extreme retaliation and more harassment including denials of media credentials and more.

Plaintiff Jane Doe expects to amend this complaint but filed it to not miss the deadlines for the NYCHRL, CPLR 214-j, Sexual Harassment, Gender Discrimination, Hostile Work Environment under New York City Human Rights Law, N.Y.C. Amin. Code 8-101 et seq (NYCHRL) that Plaintiff suffered as sexual, physical and other injury as a direct result of conduct that constitute sexual offenses as defined in Article 130 of the New York Penal Law and such acts and/or omissions, cover up were committed against Defendants including Ian Begley and Tina Cervasio among others. Defendants' actions constitute aiding and abetting crimes and coverups Pursuant to 10-1105(a) and New York Penal Law. Amends forthcoming intentionally caused attention to be distracted away from the case to help the Defendants downplay what happened to Plaintiff Jane Doe. (Cassandra Ventura vs. Sean Combs et al).

Casey Powell did have knowledge of this but used the moment to gain stature with Ian Begley and the Knicks. He set out to divert the truth from being told to increase his changes of being part of the New York Knicks media, to support his chances of receiving additional support from Ian Begley and out of greed.

The relief sought is $50 million or an amount to be determined at trial, for inter alia physical injury, economic and compensatory damages, punitive damages, attorney's fees and costs, pain suffering, harassment, sexual assault and professional losses together with any such other and further relief as this Court deems just and proper

Venue is proper as a substantial part of the events and omissions giving rise to Plaintiff's claims too place in New York County. Plaintiff designates NEW YORK COUNTY as the place of trial by jury

Filed on November 24, 2023 in New York, NY

FILED in NEW YORK SUPREME COURT in NYC

500 Pearl St, New York, NY 10007 on November 24, 2023

_____

Respectfully submitted

by Plaintiff, Pro Se

(Address Withheld from Public)

See attachment

## SERVICE PAGE

As the attorneys in New York City expressed fear of retaliation about suing James Dolan Madison Square Garden Sports Corporation for fear of being banned from The Garden related events and owned properties, every attempt has been made to make sure the Defendants have been served via the corporate counsel(s) on record.

Service was sent to:
Mr. Jamaal Lesane
c/o **Madison Square Garden Sports Corp.**
Two Pennsylvania Plaza
New York, NY 10121

Eleanor "Nell" DeVane
**ESPN Communications**
ESPN Plaza
Bristol, CT 06010

**SportsNet - New York**
4 World Trade Center
150 Greenwich Street
New York, NY 10007

**CBS Sports Network**
General Counsel
51 West 52nd Street, 25th Floor
New York, NY 10019

**New York Post**
Legal Department
1211 Avenue of the Americas
New York, NY 10036

**New York Beacon Newspaper**
GENERAL COUNSEL
The New York Beacon
600 3rd Ave, New York, NY 10016

STATEMENT of CONFIDENTIALITY for FEAR of RETALIATION

FILED in NEW YORK SUPREME COURT in NYC

500 Pearl St, New York, NY 10007 on November 24, 2023

_____

Respectfully submitted
JANE DOE mailing address submitted to
CLERK of COURT by Plaintiff

4

**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------

> TRIGGER WARNING: THE FOLLOWING CONTACTS SEXUAL FACTS, VIDEOS and STATEMENTS that might trigger survivors of sexual assault

Civil Case No.: _____

COMPLAINT FEDERAL JURY TRIAL DEMAND

**SUPREME COURT OF THE STATE
OF NEW YORK COUNT OF NEW YORK**

JANE DOE

                          Plaintiff,

v.

**JAMES DOLAN**, **NEW YORK KNICKS, NATIONAL BASKETBALL ASSOCIATION, NATIONAL BASKETBALL PLAYERS ASSOCIATION, KEVIN GARNETT, RONALD GLEN "BIG BABY" DAVIS, MADISON SQUARE GARDEN SPORTS CORPORATION, MICHELE ROBERTS** of NBA Players Association, **STEVE MILLS of Knicks and MSQ Entertainment, BRITTANY STAMOULIS** as a PERSON and REPRESENTATIVE for MADISON SQUARE GARDEN SPORTS CORPORATION, **ALYSON FURCH** NEW YORK KNICKS, **GARDEN OF DREAMS FOUNDATION,** MADISON SQUARE GARDEN SPORTS CORPORATION, **IAN BEGLEY,** ESPN SPORTS, **DERRELL JOHNSON**, NEW YORK BEACON, **TINA  CERVASIO**, SIRIUS XM and CBS SPORTS NETWORK, **CASEY POWELL** as a person and representative of KNICKS FAN TV and NBA SIRRIUS XM RADIO

-------X Plaintiff JANE DOE ("JANE DOE") hereby alleges, as and for her Complaint against Defendants as follows:

**PRELIMINARY STATEMENT** 1. WHILE ON DUTY in a professional capacity an NBA player did place his naked penis on JANE DOE in a sexually assaulting manner both intentionally with intent to sexually assault and harass the Plaintiff. The sexual actions were caught on video and recording. When Plaintiff complained to the team, the NBA Players Association, NBA league and to colleagues like Tina Cervasio and Ian Begley were aware of the situation and they chose to cover it up and were giving better access to sports stories and interviews. In addition, Plaintiff was terrorized for coming forward and faces extreme retaliation and more harassment including denials of media credentials and more.

Plaintiff Jane Doe expects to amend this complaint but filed it to not miss the deadlines for the NYCHRL, CPLR 214-j, Sexual Harassment, Gender Discrimination, Hostile Work Environment under New York City Human Rights Law, N.Y.C. Amin. Code 8-101 et seq (NYCHRL) that Plaintiff suffered as sexual, physical and other injury as a direct result of conduct that constitute sexual offenses as defined in Article 130 of the New York Penal Law and such acts and/or omissions, cover up were committed against Defendants including Ian Begley and Tina Cervasio among others. Defendants' actions constitute aiding and abetting crimes and coverups Pursuant to 10-1105(a) and New York Penal Law. Amends forthcoming intentionally caused attention to be distracted away from the case to help the Defendants downplay what happened to Plaintiff Jane Doe. (Cassandra Ventura vs. Sean Combs et al).

Casey Powell did have knowledge of this but used the moment to gain stature with Ian Begley and the Knicks. He set out to divert the truth from being told to increase his changes of being part of the New York Knicks media, to support his chances of receiving additional support from Ian Begley and out of greed.

The relief sought is $50 million or an amount to be determined at trial, for inter alia physical injury, economic and compensatory damages, punitive damages, attorney's fees and costs, pain suffering, harassment, sexual assault and professional losses together with any such other and further relief as this Court deems just and proper

Venue is proper as a substantial part of the events and omissions giving rise to Plaintiff's claims too place in New York County. Plaintiff designates NEW YORK COUNTY as the place of trial by jury

Filed on November 24, 2023 in New York, NY

FILED in NEW YORK SUPREME COURT in NYC

500 Pearl St, New York, NY 10007 on November 24, 2023

Respectfully submitted

by Plaintiff, Pro Se

(Address Withheld from Public)

See attachment

## SERVICE PAGE

As the attorneys in New York City expressed fear of retaliation about suing James Dolan Madison Square Garden Sports Corporation for fear of being banned from The Garden related events and owned properties, every attempt has been made to make sure the Defendants have been served via the corporate counsel(s) on record.

Service was sent to:
Mr. Jamaal Lesane
c/o **Madison Square Garden Sports Corp.**
Two Pennsylvania Plaza
New York, NY 10121

Eleanor "Nell" DeVane
**ESPN Communications**
ESPN Plaza
Bristol, CT 06010

**SportsNet - New York**
4 World Trade Center
150 Greenwich Street
New York, NY 10007

**CBS Sports Network**
General Counsel
51 West 52nd Street, 25th Floor
New York, NY 10019

**New York Post**
Legal Department
1211 Avenue of the Americas
New York, NY 10036

**New York Beacon Newspaper**
GENERAL COUNSEL
The New York Beacon
600 3rd Ave, New York, NY 10016

STATEMENT of CONFIDENTIALITY for FEAR of RETALIATION

FILED in NEW YORK SUPREME COURT in NYC

500 Pearl St, New York, NY 10007 on November 24, 2023

Respectfully submitted
JANE DOE mailing address submitted to
CLERK of COURT by Plaintiff

4

**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------

| TRIGGER WARNING: THE FOLLOWING CONTACTS SEXUAL FACTS, VIDEOS and STATEMENTS that might trigger survivors of sexual assault |
| --- |

Civil Case No.: _____

COMPLAINT FEDERAL JURY TRIAL DEMAND

**SUPREME COURT OF THE STATE
OF NEW YORK COUNT OF NEW YORK**

JANE DOE

                          Plaintiff,

v.

**JAMES DOLAN**, **NEW YORK KNICKS**, **NATIONAL BASKETBALL ASSOCIATION**, **NATIONAL BASKETBALL PLAYERS ASSOCIATION**, **KEVIN GARNETT**, **RONALD GLEN "BIG BABY" DAVIS**, **MADISON SQUARE GARDEN SPORTS CORPORATION**, **MICHELE ROBERTS** of NBA Players Association, **STEVE MILLS of Knicks and MSQ Entertainment**, **BRITTANY STAMOULIS** as a PERSON and REPRESENTATIVE for MADISON SQUARE GARDEN SPORTS CORPORATION, **ALYSON FURCH** NEW YORK KNICKS, **GARDEN OF DREAMS FOUNDATION**, MADISON SQUARE GARDEN SPORTS CORPORATION, **IAN BEGLEY**, ESPN SPORTS, **DERRELL JOHNSON**, NEW YORK BEACON, **TINA  CERVASIO**, SIRIUS XM and CBS SPORTS NETWORK, **CASEY POWELL** as a person and representative of KNICKS FAN TV and NBA SIRRIUS XM RADIO

1

-------X Plaintiff JANE DOE ("JANE DOE") hereby alleges, as and for her Complaint against Defendants as follows:

**PRELIMINARY STATEMENT** 1. WHILE ON DUTY in a professional capacity an NBA player did place his naked penis on JANE DOE in a sexually assaulting manner both intentionally with intent to sexually assault and harass the Plaintiff. The sexual actions were caught on video and recording. When Plaintiff complained to the team, the NBA Players Association, NBA league and to colleagues like Tina Cervasio and Ian Begley were aware of the situation and they chose to cover it up and were giving better access to sports stories and interviews. In addition, Plaintiff was terrorized for coming forward and faces extreme retaliation and more harassment including denials of media credentials and more.

Plaintiff Jane Doe expects to amend this complaint but filed it to not miss the deadlines for the NYCHRL, CPLR 214-j, Sexual Harassment, Gender Discrimination, Hostile Work Environment under New York City Human Rights Law, N.Y.C.  Amin. Code 8-101 et seq (NYCHRL) that Plaintiff suffered as sexual, physical and other injury as a direct result of conduct that constitute sexual offenses as defined in Article 130 of the New York Penal Law and such acts and/or omissions, cover up were committed against Defendants including Ian Begley and Tina Cervasio among others. Defendants' actions constitute aiding and abetting crimes and coverups Pursuant to 10-1105(a) and New York Penal Law. Amends forthcoming intentionally caused attention to be distracted away from the case to help the Defendants downplay what happened to Plaintiff Jane Doe. (Cassandra Ventura vs. Sean Combs et al).

Casey Powell did have knowledge of this but used the moment to gain stature with Ian Begley and the Knicks. He set out to divert the truth from being told to increase his changes of being part of the New York Knicks media, to support his chances of receiving additional support from Ian Begley and out of greed.

The relief sought is $50 million or an amount to be determined at trial, for inter alia physical injury, economic and compensatory damages, punitive damages, attorney's fees and costs, pain suffering, harassment, sexual assault and professional losses together with any such other and further relief as this Court deems just and proper

Venue is proper as a substantial part of the events and omissions giving rise to Plaintiff's claims too place in New York County. Plaintiff designates NEW YORK COUNTY as the place of trial by jury

Filed on November 24, 2023 in New York, NY

FILED in NEW YORK SUPREME COURT in NYC
500 Pearl St, New York, NY 10007 on November 24, 2023

_____

Respectfully submitted
by Plaintiff, Pro Se
(Address Withheld from Public)
See attachment

## SERVICE PAGE

As the attorneys in New York City expressed fear of retaliation about suing James Dolan Madison Square Garden Sports Corporation for fear of being banned from The Garden related events and owned properties, every attempt has been made to make sure the Defendants have been served via the corporate counsel(s) on record.

Service was sent to:
Mr. Jamaal Lesane
c/o **Madison Square Garden Sports Corp.**
Two Pennsylvania Plaza
New York, NY 10121


Eleanor "Nell" DeVane
**ESPN Communications**
ESPN Plaza
Bristol, CT 06010


**SportsNet - New York**
4 World Trade Center
150 Greenwich Street
New York, NY 10007


**CBS Sports Network**
General Counsel
51 West 52nd Street, 25th Floor
New York, NY 10019


**New York Post**
Legal Department
1211 Avenue of the Americas
New York, NY 10036


STATEMENT of CONFIDENTIALITY for FEAR of RETALIATION

FILED in NEW YORK SUPREME COURT in NYC

500 Pearl St, New York, NY 10007 on November 24, 2023

_____

Respectfully submitted
JANE DOE mailing address submitted to
CLERK of COURT by Plaintiff

**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------

| TRIGGER WARNING: THE FOLLOWING CONTACTS SEXUAL FACTS, VIDEOS and STATEMENTS that might trigger survivors of sexual assault |

Civil Case No.: _____

COMPLAINT FEDERAL JURY TRIAL DEMAND

**SUPREME COURT OF THE STATE**
**OF NEW YORK COUNT OF NEW YORK**

JANE DOE

                          Plaintiff,

v.

**JAMES DOLAN**, **NEW YORK KNICKS**, **NATIONAL BASKETBALL ASSOCIATION**, **NATIONAL BASKETBALL PLAYERS ASSOCIATION**, **KEVIN GARNETT**, **RONALD GLEN "BIG BABY" DAVIS**, **MADISON SQUARE GARDEN SPORTS CORPORATION**, **MICHELE ROBERTS** of NBA Players Association, **STEVE MILLS of Knicks and MSQ Entertainment**, **BRITTANY STAMOULIS** as a PERSON and REPRESENTATIVE for MADISON SQUARE GARDEN SPORTS CORPORATION, **ALYSON FURCH** NEW YORK KNICKS, **GARDEN OF DREAMS FOUNDATION**, MADISON SQUARE GARDEN SPORTS CORPORATION, **IAN BEGLEY**, ESPN SPORTS, **DERRELL JOHNSON**, NEW YORK BEACON, **TINA  CERVASIO**, SIRIUS XM and CBS SPORTS NETWORK, **CASEY POWELL** as a person and representative of KNICKS FAN TV and NBA SIRRIUS XM RADIO

--------X Plaintiff JANE DOE ("JANE DOE") hereby alleges, as and for her Complaint against Defendants as follows:

**PRELIMINARY STATEMENT** 1. WHILE ON DUTY in a professional capacity an NBA player did place his naked penis on JANE DOE in a sexually assaulting manner both intentionally with intent to sexually assault and harass the Plaintiff. The sexual actions were caught on video and recording. When Plaintiff complained to the team, the NBA Players Association, NBA league and to colleagues like Tina Cervasio and Ian Begley were aware of the situation and they chose to cover it up and were giving better access to sports stories and interviews. In addition, Plaintiff was terrorized for coming forward and faces extreme retaliation and more harassment including denials of media credentials and more.

Plaintiff Jane Doe expects to amend this complaint but filed it to not miss the deadlines for the NYCHRL, CPLR 214-j, Sexual Harassment, Gender Discrimination, Hostile Work Environment under New York City Human Rights Law, N.Y.C.  Amin. Code 8-101 et seq (NYCHRL) that Plaintiff suffered as sexual, physical and other injury as a direct result of conduct that constitute sexual offenses as defined in Article 130 of the New York Penal Law and such acts and/or omissions, cover up were committed against Defendants including Ian Begley and Tina Cervasio among others. Defendants' actions constitute aiding and abetting crimes and coverups Pursuant to 10-1105(a) and New York Penal Law. Amends forthcoming intentionally caused attention to be distracted away from the case to help the Defendants downplay what happened to Plaintiff Jane Doe. (Cassandra Ventura vs. Sean Combs et al).

Casey Powell did have knowledge of this but used the moment to gain stature with Ian Begley and the Knicks. He set out to divert the truth from being told to increase his changes of being part of the New York Knicks media, to support his chances of receiving additional support from Ian Begley and out of greed.

The relief sought is $50 million or an amount to be determined at trial, for inter alia physical injury, economic and compensatory damages, punitive damages, attorney's fees and costs, pain suffering, harassment, sexual assault and professional losses together with any such other and further relief as this Court deems just and proper

Venue is proper as a substantial part of the events and omissions giving rise to Plaintiff's claims too place in New York County. Plaintiff designates NEW YORK COUNTY as the place of trial by jury

Filed on November 24, 2023 in New York, NY

FILED in NEW YORK SUPREME COURT in NYC
500 Pearl St, New York, NY 10007 on November 24, 2023

Respectfully submitted
by Plaintiff, Pro Se
(Address Withheld from Public)
See attachment

## SERVICE PAGE

As the attorneys in New York City expressed fear of retaliation about suing James Dolan Madison Square Garden Sports Corporation for fear of being banned from The Garden related events and owned properties, every attempt has been made to make sure the Defendants have been served via the corporate counsel(s) on record.

Service was sent to:
Mr. Jamaal Lesane
c/o **Madison Square Garden Sports Corp.**
Two Pennsylvania Plaza
New York, NY 10121

Eleanor "Nell" DeVane
**ESPN Communications**
ESPN Plaza
Bristol, CT 06010

**SportsNet – New York**
4 World Trade Center
150 Greenwich Street
New York, NY 10007

**CBS Sports Network**
General Counsel
51 West 52nd Street, 25th Floor
New York, NY 10019

**New York Post**
Legal Department
1211 Avenue of the Americas
New York, NY 10036

**New York Beacon Newspaper**
GENERAL COUNSEL
The New York Beacon
600 3rd Ave, New York, NY 10016

STATEMENT of CONFIDENTIALITY for FEAR of RETALIATION

FILED in NEW YORK SUPREME COURT in NYC

500 Pearl St, New York, NY 10007 on November 24, 2023

Respectfully submitted
JANE DOE mailing address submitted to
CLERK of COURT by Plaintiff

4

**SUPREME COURT OF THE STATE OF NEW YORK**

| COUNTY OF NEW YORK -- | X | Index No.: Plaintiff designates **NEW YORK COUNTY** as the place of trial **COMPLAINT FOR SEXUAL ASSAULT, SEXUAL HARASSMENT, DISCRIMINATION, GENDER DISCRIMINATION and COVER UP BY MADISON SQUARE GARDEN CORPOATION, NEWS MEDIA SEEKING MONEY DAMAGES AND OTHER RESTITUTION** The basis of the venue is: A substantial part of the events or omissions giving rise to the claim occurred in New York County |
| --- | --- | --- |
| JANE DOE, Plaintiff, v. JAMES DOLAN, KNICKS, KEVIN GARNETT, RONALD GLEN DAVIS, IAN BEGLEY, TINA CERVASIO and all other listed Defendant (s). | : : : : : : : : : : : | |
| ---------------------------------------------------------- ----------- | X | |

**UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------

TRIGGER WARNING: THE FOLLOWING CONTACTS SEXUAL FACTS, VIDEOS and STATEMENTS that might trigger survivors of sexual assault

Civil Case No.: _____

COMPLAINT FEDERAL JURY TRIAL DEMAND

**SUPREME COURT OF THE STATE
OF NEW YORK COUNT OF NEW YORK**

JANE DOE

                                   Plaintiff,

v.

**JAMES DOLAN**, **NEW YORK KNICKS**, **NATIONAL BASKETBALL ASSOCIATION**, **NATIONAL BASKETBALL PLAYERS ASSOCIATION**, **KEVIN GARNETT**, **RONALD GLEN "BIG BABY" DAVIS**, **MADISON SQUARE GARDEN SPORTS CORPORATION**, **MICHELE ROBERTS** of NBA Players Association, **STEVE MILLS of Knicks and MSQ Entertainment**, **BRITTANY STAMOULIS** as a PERSON and REPRESENTATIVE for MADISON SQUARE GARDEN SPORTS CORPORATION, **ALYSON FURCH** NEW YORK KNICKS, **GARDEN OF DREAMS FOUNDATION**, MADISON SQUARE GARDEN SPORTS CORPORATION, **IAN BEGLEY**, ESPN SPORTS, **DERRELL JOHNSON**, NEW YORK BEACON, **TINA  CERVASIO**, SIRIUS XM and CBS SPORTS NETWORK, **CASEY POWELL** as a person and representative of KNICKS FAN TV and NBA SIRRIUS XM RADIO

--------X Plaintiff JANE DOE ("JANE DOE") hereby alleges, as and for her Complaint against Defendants as follows:

**PRELIMINARY STATEMENT** 1. WHILE ON DUTY in a professional capacity an NBA player did place his naked penis on JANE DOE in a sexually assaulting manner both intentionally with intent to sexually assault and harass the Plaintiff. The sexual actions were caught on video and recording. When Plaintiff complained to the team, the NBA Players Association, NBA league and to colleagues like Tina Cervasio and Ian Begley were aware of the situation and they chose to cover it up and were giving better access to sports stories and interviews. In addition, Plaintiff was terrorized for coming forward and faces extreme retaliation and more harassment including denials of media credentials and more.

Plaintiff Jane Doe expects to amend this complaint but filed it to not miss the deadlines for the NYCHRL, CPLR 214-j, Sexual Harassment, Gender Discrimination, Hostile Work Environment under New York City Human Rights Law, N.Y.C.  Amin. Code 8-101 et seq (NYCHRL) that Plaintiff suffered as sexual, physical and other injury as a direct result of conduct that constitute sexual offenses as defined in Article 130 of the New York Penal Law and such acts and/or omissions, cover up were committed against Defendants including Ian Begley and Tina Cervasio among others. Defendants' actions constitute aiding and abetting crimes and coverups Pursuant to 10-1105(a) and New York Penal Law. Amends forthcoming intentionally caused attention to be distracted away from the case to help the Defendants downplay what happened to Plaintiff Jane Doe. (Cassandra Ventura vs. Sean Combs et al).

Casey Powell did have knowledge of this but used the moment to gain stature with Ian Begley and the Knicks. He set out to divert the truth from being told to increase his changes of being part of the New York Knicks media, to support his chances of receiving additional support from Ian Begley and out of greed.

The relief sought is $50 million or an amount to be determined at trial, for inter alia physical injury, economic and compensatory damages, punitive damages, attorney's fees and costs, pain suffering, harassment, sexual assault and professional losses together with any such other and further relief as this Court deems just and proper

Venue is proper as a substantial part of the events and omissions giving rise to Plaintiff's claims too place in New York County. Plaintiff designates NEW YORK COUNTY as the place of trial by jury

Filed on November 24, 2023 in New York, NY

FILED in NEW YORK SUPREME COURT in NYC

500 Pearl St, New York, NY 10007 on November 24, 2023

Respectfully submitted

by Plaintiff, Pro Se

(Address Withheld from Public)

See attachment

## SERVICE PAGE

As the attorneys in New York City expressed fear of retaliation about suing James Dolan Madison Square Garden Sports Corporation for fear of being banned from The Garden related events and owned properties, every attempt has been made to make sure the Defendants have been served via the corporate counsel(s) on record.

Service was sent to:
Mr. Jamaal Lesane
c/o **Madison Square Garden Sports Corp.**
Two Pennsylvania Plaza
New York, NY 10121

Eleanor "Nell" DeVane
**ESPN Communications**
ESPN Plaza
Bristol, CT 06010

**SportsNet - New York**
4 World Trade Center
150 Greenwich Street
New York, NY 10007

**CBS Sports Network**
General Counsel
51 West 52nd Street, 25th Floor
New York, NY 10019

**New York Post**
Legal Department
1211 Avenue of the Americas
New York, NY 10036

**New York Beacon Newspaper**
GENERAL COUNSEL
The New York Beacon
600 3rd Ave, New York, NY 10016

STATEMENT of CONFIDENTIALITY for FEAR of RETALIATION

FILED in NEW YORK SUPREME COURT in NYC

500 Pearl St, New York, NY 10007 on November 24, 2023

_____

Respectfully submitted
JANE DOE mailing address submitted to
CLERK of COURT by Plaintiff

4

# EXHIBIT_____

**Supranowitz, Jonathan** <jonathan.supranowitz@msg.com>
To:KnicksCredentials@msg.com
Mon, Feb 16, 2015 at 1:32 PM
**FOR IMMEDIATE RELEASE**

## KNICKS WAIVE STOUDEMIRE

**NEW YORK, February 16, 2015 –** New York Knickerbockers President **Phil Jackson** announced today that the team has waived forward **Amar'e Stoudemire**.

"Amar'e's period as a Knickerbocker has come to pass, at his request. His time here should be marked by recognizing his effort – it was 100-percent," Jackson said. "As we move forward in structuring this team, we will look for players that exhibit his desire to win."

Stoudemire, 6-10, 245-pounds, finished his Knicks career averaging 17.3 points and 6.7 rebounds in 255 games over five seasons, while making three consecutive NBA Playoff appearances from 2011-13. His 4,411 total regular-season points ranks him 36th all-time. In 2011, Stoudemire represented New York at the NBA All-Star Game, becoming the first Knicks player to be named a starter for the Eastern Conference in 14 years, scoring 29 points.

"Everyone here at the Knicks organization appreciates the contribution Amar'e has made to the team and the entire City of New York over the past five seasons," Knicks General Manager Steve Mills said. "We have developed a relationship that has translated into a long-term friendship, and it will continue through the remainder of his NBA career, and beyond."

"I feel truly blessed to have been able to play for the incredible New York fans, Mr. Dolan, my coaches, teammates and the entire Knicks organization for the past five years," Stoudemire said. "I will be forever grateful for the opportunity to contribute positively on the court and in the community. Although I leave the Knicks with a heavy heart, I wish the organization the best of luck. Once a Knick always a Knick."



**NEW YORK KNICKERBOCKERS PUBLIC RELATIONS**
Two Pennsylvania Plaza
New York, NY 10121-0091
Tel (212) 465-6471
knicks.credentials@msg.com

**NEWS RELEASE**

**CHASE**

**FOR IMMEDIATE RELEASE**

# KNICKS WAIVE STOUDEMIRE

**NEW YORK, February 16, 2015** – New York Knickerbockers President **Phil Jackson** announced today that the team has waived forward **Amar'e Stoudemire**.

"Amar'e's period as a Knickerbocker has come to pass, at his request. His time here should be marked by recognizing his effort – it was 100-percent," Jackson said. "As we move forward in structuring this team, we will look for players that exhibit his desire to win."

Stoudemire, 6-10, 245-pounds, finished his Knicks career averaging 17.3 points and 6.7 rebounds in 255 games over five seasons, while making three consecutive NBA Playoff appearances from 2011-13. His 4,411 total regular-season points ranks him 36th all-time. In 2011, Stoudemire represented New York at the NBA All-Star Game, becoming the first Knicks player to be named a starter for the Eastern Conference in 14 years, scoring 29 points.

"Everyone here at the Knicks organization appreciates the contribution Amar'e has made to the team and the entire City of New York over the past five seasons," Knicks General Manager Steve Mills said. "We have developed a relationship that has translated into a long-term friendship, and it will continue through the remainder of his NBA career, and beyond."

"I feel truly blessed to have been able to play for the incredible New York fans, Mr. Dolan, my coaches, teammates and the entire Knicks organization for the past five years," Stoudemire said. "I will be forever grateful for the opportunity to contribute positively on the court and in the community. Although I leave the Knicks with a heavy heart, I wish the organization the best of luck. Once a Knick always a Knick."

*The NBA's New York Knickerbockers basketball team, in its 69th year of operation is part of The Madison Square Garden Company, which is comprised of three business segments: MSG Sports, MSG Media and MSG Entertainment and is built on a foundation of iconic venues and compelling content that the company creates, produces, presents and/or distributes through its programming networks and other media assets. MSG Sports owns and operates the following sports franchises: the New York Knicks (NBA), the New York Rangers (NHL), the New York Liberty (WNBA), the Westchester Knicks (NBADL) and the Hartford Wolf Pack (AHL). MSG Sports also features the presentation of a wide variety of live sporting events including professional boxing, college basketball, bull riding and tennis. MSG Media is a leader in production and content   development for multiple distribution platforms, including content originating from the Company's venues. MSG Media's television networks consist of regional sports networks, MSG Network and MSG+, collectively referred to as MSG Networks.  MSG Entertainment is one of the country's leaders in live entertainment. MSG Entertainment creates, produces and/or presents a variety of live productions, including the Radio City Christmas Spectacular and the New York Spring Spectacular, both featuring the Rockettes.  MSG Entertainment also presents or hosts other live entertainment events such as concerts, family shows and special events in the Company's diverse collection of venues. These venues consist of Madison Square Garden, The Theater at Madison Square Garden, Radio City Music Hall, the Beacon Theatre, the Forum in Inglewood, CA, The Chicago Theatre, and the Wang Theatre in Boston, MA. More information is available at www.themadisonsquaregardencompany.com.*

### # # #

**NBA World Champions:** 1970, 1973 ● Eastern Conference Champions: 1951, 1952, 1953, 1970, 1972, 1973, 1994, 1999 ● Atlantic Division Champions: 1971, 1989, 1993, 1994, 2013



**THE MADISON SQUARE GARDEN COMPANY**

# EXHIBIT_____

**Supranowitz, Jonathan** <jonathan.supranowitz@msg.com>
To:KnicksCredentials@msg.com
Mon, Feb 16, 2015 at 1:32 PM
**FOR IMMEDIATE RELEASE**

## KNICKS WAIVE STOUDEMIRE

**NEW YORK, February 16, 2015** – New York Knickerbockers President **Phil Jackson** announced today that the team has waived forward **Amar'e Stoudemire**.

"Amar'e's period as a Knickerbocker has come to pass, at his request. His time here should be marked by recognizing his effort – it was 100-percent," Jackson said. "As we move forward in structuring this team, we will look for players that exhibit his desire to win."

Stoudemire, 6-10, 245-pounds, finished his Knicks career averaging 17.3 points and 6.7 rebounds in 255 games over five seasons, while making three consecutive NBA Playoff appearances from 2011-13. His 4,411 total regular-season points ranks him 36th all-time. In 2011, Stoudemire represented New York at the NBA All-Star Game, becoming the first Knicks player to be named a starter for the Eastern Conference in 14 years, scoring 29 points.

"Everyone here at the Knicks organization appreciates the contribution Amar'e has made to the team and the entire City of New York over the past five seasons," Knicks General Manager Steve Mills said. "We have developed a relationship that has translated into a long-term friendship, and it will continue through the remainder of his NBA career, and beyond."

"I feel truly blessed to have been able to play for the incredible New York fans, Mr. Dolan, my coaches, teammates and the entire Knicks organization for the past five years," Stoudemire said. "I will be forever grateful for the opportunity to contribute positively on the court and in the community. Although I leave the Knicks with a heavy heart, I wish the organization the best of luck. Once a Knick always a Knick."



*NEW YORK KNICKERBOCKERS*
*PUBLIC RELATIONS*
Two Pennsylvania Plaza
New York, NY 10121-0091
Tel (212) 465-6471
knicks.credentials@msg.com

# *NEWS RELEASE*

**FOR IMMEDIATE RELEASE**

# KNICKS WAIVE STOUDEMIRE

**NEW YORK, February 16, 2015 –** New York Knickerbockers President **Phil Jackson** announced today that the team has waived forward **Amar'e Stoudemire**.

"Amar'e's period as a Knickerbocker has come to pass, at his request. His time here should be marked by recognizing his effort – it was 100-percent," Jackson said. "As we move forward in structuring this team, we will look for players that exhibit his desire to win."

Stoudemire, 6-10, 245-pounds, finished his Knicks career averaging 17.3 points and 6.7 rebounds in 255 games over five seasons, while making three consecutive NBA Playoff appearances from 2011-13. His 4,411 total regular-season points ranks him 36th all-time. In 2011, Stoudemire represented New York at the NBA All-Star Game, becoming the first Knicks player to be named a starter for the Eastern Conference in 14 years, scoring 29 points.

"Everyone here at the Knicks organization appreciates the contribution Amar'e has made to the team and the entire City of New York over the past five seasons," Knicks General Manager Steve Mills said. "We have developed a relationship that has translated into a long-term friendship, and it will continue through the remainder of his NBA career, and beyond."

"I feel truly blessed to have been able to play for the incredible New York fans, Mr. Dolan, my coaches, teammates and the entire Knicks organization for the past five years," Stoudemire said. "I will be forever grateful for the opportunity to contribute positively on the court and in the community. Although I leave the Knicks with a heavy heart, I wish the organization the best of luck. Once a Knick always a Knick."

*The NBA's New York Knickerbockers basketball team, in its 69th year of operation is part of The Madison Square Garden Company, which is comprised of three business segments: MSG Sports, MSG Media and MSG Entertainment and is built on a foundation of iconic venues and compelling content that the company creates, produces, presents and/or distributes through its programming networks and other media assets. MSG Sports owns and operates the following sports franchises: the New York Knicks (NBA), the New York Rangers (NHL), the New York Liberty (WNBA), the Westchester Knicks (NBADL) and the Hartford Wolf Pack (AHL). MSG Sports also features the presentation of a wide variety of live sporting events including professional boxing, college basketball, bull riding and tennis. MSG Media is a leader in production and content  development for multiple distribution platforms, including content originating from the Company's venues. MSG Media's television networks consist of regional sports networks, MSG Network and MSG+, collectively referred to as MSG Networks.  MSG Entertainment is one of the country's leaders in live entertainment. MSG Entertainment creates, produces and/or presents a variety of live productions, including the Radio City Christmas Spectacular and the New York Spring Spectacular, both featuring the Rockettes.  MSG Entertainment also presents or hosts other live entertainment events such as concerts, family shows and special events in the Company's diverse collection of venues. These venues consist of Madison Square Garden, The Theater at Madison Square Garden, Radio City Music Hall, the Beacon Theatre, the Forum in Inglewood, CA, The Chicago Theatre, and the Wang Theatre in Boston, MA. More information is available at www.themadisonsquaregardencompany.com.*

### ###

**NBA World Champions:** 1970, 1973 ⬤ **Eastern Conference Champions:** 1951, 1952, 1953, 1970, 1972, 1973, 1994, 1999 ⬤ **Atlantic Division Champions:** 1971, 1989, 1993, 1994, 2013



**SUPREME COURT OF THE STATE OF NEW YORK**

| COUNTY OF NEW YORK -- | X | Index No.:<br>Plaintiff designates **NEW YORK COUNTY** as the place of trial<br>**COMPLAINT FOR SEXUAL ASSAULT, SEXUAL HARASSMENT, DISCRIMINATION, GENDER DISCRIMINATION and COVER UP BY MADISON SQUARE GARDEN CORPOATION, NEWS MEDIA SEEKING MONEY DAMAGES AND OTHER RESTITUTION**<br>The basis of the venue is:<br>A substantial part of the events or omissions giving rise to the claim occurred in New York County |
|---|---|---|
| JANE DOE,<br>Plaintiff,<br>v.<br>JAMES DOLAN, KNICKS, KEVIN GARNETT, RONALD GLEN DAVIS, IAN BEGLEY, TINA CERVASIO and all other listed Defendant (s). | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | |
| ------------------------------------------------------------<br>----------- | X | |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------X

CASANDRA VENTURA             :

                 Plaintiff,     :

                         :

        v.                 :

                         :

SEAN COMBS, BAD BOY ENTERTAINMENT,   :
BAD BOY RECORDS, EPIC RECORDS, COMBS  :
ENTERPRISES, LLC, and DOE CORPS. 1-10,    :

                         :

           Defendants.     :
--------------------------------------------------------------X

Civil Case No.: 23-cv-10098

**COMPLAINT**

**JURY TRIAL DEMAND**

---

| TRIGGER WARNING: |
| :---: |
| **THIS DOCUMENT CONTAINS HIGHLY GRAPHIC INFORMATION OF A SEXUAL NATURE, INCLUDING SEXUAL ASSAULT** |

---

Plaintiff Casandra Ventura ("Ms. Ventura") hereby alleges, as and for her Complaint against Defendant Sean Combs ("Mr. Combs"), Bad Boy Entertainment, Bad Boy Records, Epic Records, Combs Enterprises, LLC, and Doe Corporations 1-10 (together, "Defendant Corporations," and together with Mr. Combs, "Defendants") as follows:

**PRELIMINARY STATEMENT**

1. Defendant Sean Combs is a rapper and record executive popularly known by his stage names Puff Daddy, P. Diddy, or Diddy. Mr. Combs came to fame in the early 1990s with his record label Bad Boy Records. He rose to prominence in the music and entertainment industry over the decades and is regularly referred to as a hip-hop mogul.

2. In 2022, Mr. Combs received the Lifetime Achievement Award at the BET Awards. During his acceptance speech, Mr. Combs stated, "I have to give a special shoutout, thank you, love, to the people that was really there for me." He named a number of people, before adding, "[a]nd also Cassie, for holding me down in the dark times, love."

1

3.      The truth, however, is that Cassie—Ms. Casandra Ventura—was held down by

Mr. Combs and endured over a decade of his violent behavior and disturbed demands.  For Ms.

Ventura, the "dark times" were those she spent trapped by Mr. Combs in a cycle of abuse,

violence, and sex trafficking.  Among other violent and unlawful acts, Mr. Combs:

- Raped Ms. Ventura in her own home after she tried to leave him;

- Often punched, beat, kicked and stomped on Ms. Ventura, resulting in bruises, burst lips, black eyes and bleeding;

- Blew up a man's car after he learned that he was romantically interested in Ms. Ventura;

- Forced Ms. Ventura to engage in sex acts with male sex workers while masturbating and filming the encounters;

- Ran out of his apartment with a firearm in pursuit of a rival industry executive whom he learned was nearby;

- Demanded that Ms. Ventura to carry his firearm in her purse just to make her uncomfortable and demonstrate how dangerous he is; and

- Introduced Ms. Ventura to a lifestyle of excessive alcohol and substance abuse and required her to procure illicit prescriptions to satisfy his own addictions.

4.      Ms. Ventura met Mr. Combs in 2005, when she was nineteen years old and he was

thirty-seven years old.  He signed her to his label, Bad Boy Records, and within a few years,

lured Ms. Ventura into an ostentatious, fast-paced, and drug-fueled lifestyle, and into a romantic

relationship with him—her boss, one of the most powerful men in the entertainment industry,

and a vicious, cruel, and controlling man nearly two decades her senior.

5.      Mr. Combs asserted complete control over Ms. Ventura's personal and

professional life, thereby ensuring her inability to escape his hold.  He provided unprecedented

avenues for success for the aspiring artist, but in return, demanded obedience, loyalty, and silence.

6.     Throughout their relationship Mr. Combs was prone to uncontrollable rage, and frequently beat Ms. Ventura savagely.  These beatings were witnessed by Mr. Combs' staff and employees of Bad Boy Entertainment and Mr. Combs's related businesses, but no one dared to speak up against their frightening and ferocious boss.

7.     Following these episodes of horrific abuse, Mr. Combs would immediately attempt to hide Ms. Ventura and the evidence of his violent rage.  He often showered her with gifts following incidents of physical violence, a typical pattern of behavior by serial abusers.

8.     In addition to the physical assaults, Mr. Combs frequently reminded Ms. Ventura of his ability to cause serious harm, whether by requiring her to carry his gun in her purse or by blowing up the car of a musician that was romantically interested in Ms. Ventura.

9.     Adding insult to injury, Mr. Combs used illegal substances and threats of violence to force Ms. Ventura into repeated unwanted sexual encounters with male sex workers.

10.     Over the years that Mr. Combs abused Ms. Ventura physically and sexually, she again and again tried to escape his tight hold over her life.  Every time she hid, Mr. Combs's vast network of corporations and affiliated entities found her, and those who worked for Mr. Combs's companies implored her to return to him.  Many went as far as to explicitly state that her failure to return to Mr. Combs would hinder her success in the entertainment industry.

11.     When she believed that she had finally separated from her long-time abuser, she joined Mr. Combs for a dinner, after which he forced her into her home and raped her while she repeatedly said "no" and tried to push him away.

3

12.     Ms. Ventura has now fully escaped Mr. Combs, but the harm that the assaults and sexual abuse he caused her to experience for nearly a decade will forever haunt her.  She has required intensive medical and psychological care to recover from the trauma she lived through.

13.     She cannot, however, continue to live in silence about what she endured.  Mr. Combs remains immensely powerful, and immensely dangerous.  Ms. Ventura therefore seeks justice for the decade of her life that Mr. Combs took away from her with threats of violence, excessive use of drugs, physical and psychological abuse, and sexual slavery.

14.     Accordingly, Ms. Ventura brings this action seeking injunctive, declaratory and monetary relief against Defendants in violation of federal sex trafficking laws, 18 U.S.C. § 1591, *et seq.*, the New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.* ("NYCHRL"), the Gender Motivated Violence Act, N.Y.C. Admin. Code §§ 8-901, *et seq.* ("GMVA"), the New York Services for Victims of Human Trafficking, N.Y. Servs. Law § 483-BB, the California Sexual Abuse and Cover Up Accountability Act, Cal. Civ. Proc. § 340.16, and the California Trafficking Victims Protection Act, Cal. Civil Code § 52.5.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, as this action asserts violations of 18 U.S.C. § 1591, *et seq.*, and therefore raises federal questions regarding the deprivation of Plaintiff's rights.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and city law pursuant to 28 U.S.C. § 1367(a).

16.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action, including the unlawful

employment practices and intentional and negligent tortious conduct alleged herein, occurred in this district.

## **PARTIES**

17.     Plaintiff Casandra Ventura is a resident of the States of California and Connecticut, and was employed by Defendants Bad Boy Records LLC and Bad Boy Entertainment and related entities (among them, Doe Corporations 1-10) from 2006 to 2019. At all relevant times herein, Ms. Ventura met the definition of an "employee" of Defendants under all relevant statutes.

18.     Defendant Sean Combs, upon information and belief, resides within the State of California. At all relevant times herein, Mr. Combs met the definition of an "employer" of Plaintiff under all relevant statutes.

19.     Defendant Bad Boy Entertainment is a music, media, and entertainment company founded by Defendant Sean Combs, which includes the record label Defendant Bad Boy Records LLC. At all relevant times, Defendant was an "employer" of Plaintiff within the meaning of all applicable statutes.

20.     Defendant Bad Boy Records LLC is a Delaware limited liability company with a principal place of business located in New York, New York. At all relevant times, Defendant was an "employer" of Plaintiff within the meaning of all applicable statutes.

21.     Defendant Epic Records is a New York based record label owned by Sony Music Entertainment, a subsidiary of Sony Corporation of America. At all relevant times, Defendant was an "employer" of Plaintiff within the meaning of all applicable statutes.

22.      Defendant Combs Enterprises, LLC is a New York limited liability company.  At all relevant times, Defendant was an "employer" of Plaintiff within the meaning of all applicable statutes.

23.      Defendant Doe Corporations 1-10 are corporations and entities affiliated and associated with Defendants Sean Combs and the Defendant Corporations.  At all relevant times, Defendant Doe Corporations 1-10 were "employers" of Plaintiff within the meaning of all applicable statutes.

## FACTUAL ALLEGATIONS

**I.     Teenaged Ms. Ventura Meets Middle-Aged Mr. Combs as Her Career Begins**

24.      Ms. Ventura met Mr. Combs in late 2005 or early 2006, after Mr. Combs heard Ms. Ventura's first single playing in a club and expressed interest in signing her to his label, Bad Boy Records.

25.      At the time, Ms. Ventura was 19 years old.  Mr. Combs was 37 years old.

26.      Within months, in February 2006, Ms. Ventura signed a ten-album deal with Mr. Combs's record label.

27.      Ms. Ventura's first album, Cassie, was released in August 2006, debuting at number four on the U.S. Billboard 200.

28.      To promote the album, Ms. Ventura made television appearances on MTV's Total Request Live and BET's 106 & Park.  Ms. Ventura suffered from significant performance anxiety during these appearances, and press outlets were highly critical of Ms. Ventura's performances on these shows.

8

35.     Emphasizing the age and power dynamic, early on in their working relationship,
Mr. Combs positioned himself as a father figure and protector of Ms. Ventura.  By way of
example, after returning to New York after a trip to Las Vegas, during which she endured a brief
hospital stay, Ms. Ventura, who by then was fully healthy, went out to a club with her friends.
When Mr. Combs saw her out, he reprimanded her, telling her to go home and take care of
herself.  At the time, Ms. Ventura thought that her record label was looking out for her wellbeing,
and that Mr. Combs had her best interests in mind.

36.     Mr. Combs also ensured he was intertwined with Ms. Ventura's personal and
social life, for instance, by inviting himself to Ms. Ventura's 21st birthday party in Las Vegas.  He
also brought along famous musicians and producers, thereby flaunting his celebrity status and
influence in front of a young and impressionable Ms. Ventura.

37.     Although Mr. Combs knew that Ms. Ventura was in a relationship at the time, and
even though he was publicly in a relationship with Kim Porter, Mr. Combs nevertheless pursued
Ms. Ventura.  At an afterparty in a hotel suite following Ms. Ventura's 21st birthday party, Mr.
Combs pulled Ms. Ventura into a bathroom and forcibly kissed her.  Ms. Ventura did not consent
to this unwanted contact.  She immediately ran out of the bathroom and the hotel suite and cried.
She told her best friend at the time about what had happened but was too scared to tell anyone
else.

38.     At the Video Music Awards the following day, Ms. Ventura's boyfriend at the time
joined her and Mr. Combs at a table at the awards ceremony.  Mr. Combs became angry, telling

7

29.     Mr. Combs, however, sought to rehabilitate his newly signed talent, telling MTV News:

> You could hear the nervousness in her voice. And to be honest, I kind of smiled at it, because it made me really appreciate what I really love about her: She's a regular person. . . . It just made me appreciate that she got nervous, and it was kind of cute to me, to be honest. . . . You've got to understand that success for her is coming out of nowhere. It's just so huge, and sometimes everybody handles it differently.

30.     While clearly paternalistic in noting that it was "cute" to him how "regular" Ms. Ventura appeared, Mr. Combs' comments rang true to some extent—upon signing with Bad Boy Records, Ms. Ventura was quickly thrust into the spotlight, and was unfamiliar with how to navigate her new celebrity status.

31.     Mr. Combs' recognition and glorification of Ms. Ventura's naivete proved to set the groundwork for his manipulative and coercive romantic and sexual relationship with Ms. Ventura, a woman nearly two decades his junior.

32.     Within a year of signing with Bad Boy Records, Mr. Combs became deeply entrenched in Ms. Ventura's life, almost immediately asserting possession and control over her, and inserting himself into all aspects of her career and her personal life.

33.     In November 2006, Mr. Combs invited Ms. Ventura to perform his song "Come to Me" along with him at the MTV Europe Music Awards in Copenhagen, Denmark.  After rehearsal for the performance, Mr. Combs walked around in a robe with a drink in his hand, flaunting his lavish party lifestyle to his label's newly signed artist.

34.     During hair and makeup leading up to the performance, Ms. Ventura's hairstylist and Mr. Combs's makeup artist told Ms. Ventura that Mr. Combs was "interested" in Ms.

Ms. Ventura that the invitation to the awards ceremony was only for her, and not for her significant other.

## II.     Mr. Combs Lures Ms. Ventura into a Relationship

39.     Despite her clear rejection of Mr. Combs' advances, Mr. Combs continued to demand Ms. Ventura spend time with him, including for a weekend at Mr. Combs' residence in Miami, and for nights out in New York City.

40.     On one particular night around September 2007, Mr. Combs insisted on taking Ms. Ventura out. Ms. Ventura acquiesced, fearing that rejecting Mr. Combs' request would have repercussions for her album deal with Mr. Combs and his company, Bad Boy records.

41.     Mr. Combs picked up Ms. Ventura from her apartment in Manhattan in a blue luxury vehicle. Ms. Ventura was surprised that when she got into the car, Mr. Combs was already inebriated.

42.     He handed her a pill and told her to take it; when Ms. Ventura asked what the pill was, Mr. Combs dismissed her and told her she would like it. She later learned the pill was ecstasy—something Ms. Ventura had never before tried and did not want to try. This was the first time Mr. Combs got Ms. Ventura high.

43.     Mr. Combs then proceeded to drive recklessly at very high speeds down the West Side Highway of Manhattan. Ms. Ventura was very scared, but did not dare to object to Mr. Combs, who appeared drunk, high, and agitated.

44.     Mr. Combs took Ms. Ventura to an upscale lounge in downtown Manhattan, where he proceeded to get into an altercation with the security staff who would not permit Mr. Combs to enter, presumably because he was belligerent. Ms. Ventura decided to go home, but

for the remainder of the night Mr. Combs messaged Ms. Ventura incessantly, complaining that he left him high and alone.

45.     In early fall 2007, Mr. Combs flexed his power and influence when he paid a promoter to create a fake flyer for a party hosted by Ms. Ventura—this fake posting allowed Ms. Ventura to have an excuse to go to Miami, Florida and get her away from her boyfriend by using the guise of a legitimate event she had to attend.  Ms. Ventura was stunned at how easily Mr. Combs was able to recruit others to lie for him.

46.     Ms. Ventura was uncomfortable with the fake flyer.  But because the request to go to Miami was made by the owner of her record label, and because she was scared to go against his wishes and face repercussions to her nascent career, Ms. Ventura agreed to join Mr. Combs in Florida.

47.     During this trip to Miami, Mr. Combs provided Ms. Ventura with copious amounts of drugs—she became more intoxicated than she ever had before, and her intoxication lasted throughout the weekend trip.  As she wanted Mr. Combs to continue to support her career, she felt she could not refuse Mr. Combs' urging her to take more drugs.  After providing her with drugs, Mr. Combs had sexual intercourse with Ms. Ventura during this trip.

48.     Within two years of meeting Mr. Combs, Ms. Ventura found herself lured into the immediate circle of her boss, the owner of her record label, and one of the most powerful men in the entertainment industry.

III.    **Mr. Combs Exerts Control Over Ms. Ventura's Career and Personal Life**

49.     From the very start of their relationship, Mr. Combs exerted his power and influence over Ms. Ventura.  This dynamic was fueled by their nearly twenty-year age difference

as well as their relative positions in the entertainment industry—with Mr. Combs considered a music "mogul" and Ms. Ventura at the very start of her career as an entertainer.

50.    Mr. Combs's aggressive and demanding approach to those he worked with made it impossible for anyone to challenge him, and Ms. Ventura soon learned that Mr. Combs insisted on blind loyalty from everyone in his inner circle.

51.    Although Ms. Ventura had saved up some earnings from her young modelling career, Mr. Combs's ostentatious display of wealth was intimidating to her.

52.    Mr. Combs paid for things with "wads of cash," and would repeatedly tell Ms. Ventura, "Don't worry about money, I have money."

53.    Mr. Combs expensed lavish vacations for him and Ms. Ventura, purchased a car for her, paid for her apartment, and provided her with extensive amounts of designer clothing.

54.    Around 2008 or 2009, Mr. Combs began to rent an apartment in Manhattan for Ms. Ventura. The apartment was within walking distance of Mr. Combs's New York residence. He first showed Ms. Ventura the apartment by bringing her there along with her parents. Ms. Ventura's parents were skeptical of the mogul's displays of wealth, but proud of their daughter's newfound success.

55.    Around 2010, Mr. Combs similarly paid for an apartment for Ms. Ventura in Los Angeles, which was located about five minutes away from Mr. Combs's residence. He paid for many of her apartments in California, and also purchased a Jaguar for her around 2013 or 2014.

56.    All aspects of Ms. Ventura's life were controlled by either Mr. Combs or his management companies. Every event Ms. Ventura attended, from the travel to the makeup and clothing, was paid for directly by Mr. Combs and his affiliated companies.

57.     Compounding this all-encompassing intrusion into her life, Mr. Combs secured his control over the young and impressionable Ms. Ventura by introducing her to a drug-fueled lifestyle that kept her complacent and compliant.  Mr. Combs first introduced Ms. Ventura to opiates around 2008, and would often have pills and other drugs out in the open "like candy." Upon information and belief, Mr. Combs has been addicted to prescription painkillers and took ecstasy frequently.

58.     At first, Ms. Ventura was given the prescriptions that Mr. Combs received from a doctor in Miami, Florida.  Eventually, when Mr. Combs exhausted his supply of pills, he demanded that Ms. Ventura procure prescriptions from this Miami doctor in her own name.

59.     Mr. Combs also became deeply involved in Ms. Ventura's personal life, with his personal staff attending to Ms. Ventura's day-to-day travel and other needs, including medical care.  On multiple occasions, Mr. Combs had Ms. Ventura's personal medical records sent directly to his email address.  For instance, when Ms. Ventura began experiencing memory loss—potentially due to excessive drug use and/or head injuries caused by Mr. Combs's beatings, as described below—her MRI results were provided directly to Mr. Combs.  Mr. Combs also repeatedly arranged for his staff to drive Ms. Ventura to certain doctors' appointments.

60.     In this way, Mr. Combs exerted ownership over Ms. Ventura.  As another example of the ways in which he manipulated Ms. Ventura and ensured obedience, early on in their relationship, he asked Ms. Ventura what she called her grandfather.  When Mr. Ventura said that she referred to her grandfather as "Pop Pop," Mr. Combs perversely insisted that Ms. Ventura refer to him with that nickname.

Case 1:23-cv-10098 Document 1 Filed 11/16/23 Page 14 of 35

what had happened at the hands of this incredibly powerful man. She spent the subsequent three days hiding in her apartment.

66. In January 2009, after Mr. Combs learned that Ms. Ventura spoke to another music manager at a party in Los Angeles, he became enraged. She had hoped speaking to this manager would allow her to further grow her career, and that Mr. Combs would be happy for her, but instead he became extremely angry and pulled her out of the club where the party was taking place.

67. In the car leaving the club, Mr. Combs beat Ms. Ventura, pushing her into a corner of the vehicle and stomping on her face. Mr. Combs's security staff, Roger Bonds, tried to stop the beating, but was unable to deescalate the situation. When the car arrived at Mr. Combs' residence, Ms. Ventura attempted to run away, but Mr. Combs followed her and proceeded to again kick her in the face. Ms. Ventura was bleeding profusely, and was ushered into Mr. Combs' home, where she began to throw up from the violent assault.

68. Upon recognizing the damage he had done and the physical evidence of his abuse, Mr. Combs panicked, and forced his staff to bring Ms. Ventura to a hotel suite at The London Hotel in Los Angeles, where she was required to stay for a week.

69. During this stay, as her injuries from the beating healed, Ms. Ventura began to fully realize that Mr. Combs's tremendously loyal network not only knew about and witnessed his assault, but also that these witnesses were not willing to do anything meaningful to stop Mr. Combs's behavior. She recognized that she was powerless, and that reporting Mr. Combs to the authorities would not alter Mr. Combs's status or influence but would merely give Mr. Combs another excuse to hurt her.

## IV.     Mr. Combs and Ms. Ventura's Relationship Becomes Violent and Abusive

61.     What started as a whirlwind of celebrity meetings and drug-and-alcohol-fueled parties, however, quickly turned frightening and violent.

62.     Ms. Ventura was also exposed to the intense violence that pervaded Mr. Combs's rise to fame.  For example, on one occasion when Mr. Combs and Ms. Ventura were using drugs together in his home, one of his security staff barged in and announced that Suge Knight—a longtime rival of Mr. Combs—was spotted at Mel's Drive-In Diner in Los Angeles.  Mr. Combs began to get dressed, retrieved multiple guns from a safe and ran out of his home to where he believed Mr. Knight was dining.  Ms. Ventura became terrified and began to cry.

63.     On at least two occasions, Mr. Combs demanded that Ms. Ventura hold Mr. Combs's gun in her purse.  Ms. Ventura had no familiarity with guns and was petrified that the firearm would accidentally go off in her purse.  There was no clear reason why Mr. Combs required her to hold his guns, except to reinforce to his young girlfriend that he was violent, powerful, and dangerous.

64.     Over the next decade, multiple times each year, Mr. Combs would violently beat Ms. Ventura, leaving bruises on her body.  After every instance in which he beat Ms. Ventura, Mr. Combs used his money and power to orchestrate extensive efforts to hide the evidence of his abuse, including by hiding Ms. Ventura in hotels for days at a time to let her bruises heal.

65.     In one such instance, after a party with Jay-Z, Mr. Combs beat Ms. Ventura repeatedly in an Escalade, including by kicking and hitting her.  He forced her out of the vehicle on Fifth Avenue in New York City.  She was eventually able to hail a cab and get to her apartment in Manhattan, where she cried in fear, realizing there was no one she could tell about

13

70.     While in the hotel, she asked to go home to her parents, but Mr. Combs wouldn't let her leave.  She lied to her mother when asked about an online gossip forum that reported the assault.

71.     Mr. Combs proceeded to instruct his assistant to purchase excessive amounts of gifts for Ms. Ventura, which were delivered to the hotel room where she remained trapped.

72.     Ms. Ventura was terrified, isolated, and unable to see a pathway out of Mr. Combs' abusive hold on her life.

73.     She found herself becoming numb to the abuse she was experiencing, and became entirely beholden to Mr. Combs's demands.  She began to blindly follow his instructions out of fear of again being on the receiving end of a vicious beating.

74.     By Mr. Combs's own admission, his relationship with Ms. Ventura was like "Bobby and Whitney," a clear acknowledgement of the unequal power dynamic and excessive domestic violence that permeated their relationship.  From the outside looking in, Ms. Ventura had heard others refer to her relationship with Mr. Combs as akin to "Ike and Tina."

75.     Her volatile and abusive partner—who also owned her label and therefore held her future success in his hands—had fully exerted control over every aspect of her life.

## V.     Mr. Combs Forces Ms. Ventura Into Sex Trafficking

76.     Within a few months of beginning a romantic relationship with forty-year-old Mr. Combs, the twenty-two-year-old Ms. Ventura felt beholden to his whims and demands.

77.     While in New York City, Mr. Combs told the Ms. Ventura that he wanted to engage in a fantasy of his called "voyeurism."  Mr. Combs said that it would "turn him on" if he saw Ms. Ventura "with another dick."

78.     The first time, Mr. Combs hired a man and brought the man to his home in Los Angeles. The man, Mr. Combs, and Ms. Ventura wore masquerade masks, and ingested drugs. Mr. Combs directed Ms. Ventura to perform sexual acts with this man while Mr. Combs watched them. He masturbated while he directed Ms. Ventura and the man to do specific sexual acts.

79.     The entire encounter lasted multiple days.

80.     Mr. Combs began to call the arrangement a "Freak Off," or "FO." He would repeatedly tell Ms. Ventura at random moments that he wanted an FO, and Ms. Ventura was eventually expected to facilitate the location and the hiring of male sex workers.

81.     At certain points during Ms. Ventura and Mr. Combs's relationship, he would insist on an FO weekly. Mr. Combs would repeatedly tell Ms. Ventura that this practice was "our thing" and "our secret."

82.     FOs would often take place in hotel suites, include at the Trump International Hotel in Columbus Circle, L'ermitage Beverly Hills, The London Hotel in Los Angeles, the InterContinental Century City, the InterContinental Atlanta, the InterContinental New York City, The One Hotel in New York and in Miami, the Mandarin Oriental Hotel in New York and in Miami, the Fontainebleau in Miami, the Beverly Hills Hotel, and Shutters on the Beach in Los Angeles.

83.     On one occasion around 2013, Mr. Combs had an FO set up at the InterContinental Hotel in New York City, after which he was charged with tens of thousands of dollars in damages by the hotel. Upon information and belief, Mr. Combs's Chief of Staff Toni Fletcher paid the invoice charged by the hotel.

84.     Ms. Ventura was eventually instructed to use websites and escort services to find male sex workers to participate the FOs.  Mr. Combs told Ms. Ventura to search for "large black penises" on the website.

85.     Sometimes, Mr. Combs would pay to fly male sex workers to his location, including to multiple cities in the United States as well as abroad.  He required Ms. Ventura and his staff to help him make these arrangements.

86.     Mr. Combs's assistants would help to set up the FOs, including by setting up the hotel suites with baby oil and Astroglide.

87.     Mr. Combs always supplied Ms. Ventura (and the sex worker) with copious amounts of drugs before and during the FOs.  Ms. Ventura was given ecstasy, cocaine, GHB, ketamine, marijuana, and alcohol in excessive amounts during FOs, which allowed her to disassociate during these horrific encounters.  It became common place to get IV fluids in the days after an FO to recover from the excessive substances pushed upon her.

88.     Ms. Ventura was required to dress up in lingerie for an FO, and Mr. Combs insisted she wear white nail polish to contrast her nails with the skin of the Black men he hired to have sex with her.

89.     During the FO, Mr. Combs would instruct Ms. Ventura to pour excessive amounts of oil over herself.

90.     Mr. Combs would then instruct Ms. Ventura and the sex workers to speak to each other, and then would specifically tell Ms. Ventura where to touch the sex workers.  Mr. Combs would say things like, "grab that big Black dick" and ask her "how does it feel?" as he directed her to perform for him.

91.    During the FOs, in addition to directing Ms. Ventura and masturbating, Mr. Combs would use his phone, laptop, and tablet to film Ms. Ventura having sex with the hired sex worker. He treated the forced encounter as a personal art project, adjusting the candles he used for lighting to frame the videos he took.

92.    While Ms. Ventura quickly deleted any photographs or video of sex acts if they were taken on her phone, Mr. Combs repeatedly made clear that he retained many videos of Ms. Ventura during FOs.

93.    Even when she deleted the videos, Mr. Combs would tell Ms. Ventura that he was able to recover deleted videos from her devices. On one occasion, he sat next to her on a flight and made her watch a video she thought she had deleted, reinforcing her inability to escape and the immense power he held over her.

94.    Mr. Combs would pay the male sex workers a few thousand dollars in cash for their services.

95.    During some FOs, Mr. Combs would become extremely intoxicated and would hit Ms. Ventura in front of the male sex workers.

96.    Ms. Ventura was repulsed by Mr. Combs's demands, but between the physical beating and recognizing his incredible power and incredible temper, Ms. Ventura became petrified of her partner and boss, and felt that she could not say no.

97.    He even would present her with lavish gifts prior to or in the middle of the FOs, seemingly acknowledging the ways in which these forced sexual encounters constituted "work" for Ms. Ventura and that he needed to compensate her for this work. At one point, he had given her so many designer bracelets for FOs (and immediately following his brutal beatings) that she felt that she was shackled by his presents.

98.     Frequently, her anxiety before an FO would become so great that she would become physically ill, sometimes to the point of vomiting.  While kneeling over the toilet, Mr. Combs would shame her into performing for him, eventually forcing her to get up and proceed with the encounter.

99.     She knew firsthand that telling Mr. Combs that she did not want to engage in FOs was met with anger and violence.

100.    In addition, any suggestion that Ms. Ventura would refuse the FO or otherwise report Mr. Combs's abuse was met with ultimatums by Mr. Combs, who would say that Ms. Ventura could not go to the police because she had "a lot to lose."

101.    Around August 2015, for example, in the middle of surprise birthday dinner for Ms. Ventura's 29th birthday, Mr. Combs insisted that Ms. Ventura leave the party and go to a hotel for an FO.  When she expressed that she did not want to go, Mr. Combs had Ms. Ventura cornered by his security staff in order to force her to leave with him.

102.    After this FO, Mr. Combs and Ms. Ventura went back to the hotel room that Ms. Ventura was staying in, where some of Ms. Ventura's friends were already hanging out.  Mr. Combs was severely intoxicated, and at one point during the night, picked up one of Ms. Ventura's friends like a child and dangled the friend over the balcony of the 17th floor hotel suite. Ms. Ventura and her friends were scared by Mr. Combs's erratic behavior, but Ms. Ventura was heavily sedated because of the drugs she took to participate in the FO, and therefore was unable to respond to Mr. Combs's terrifying behavior.

103.    The FOs became work for Ms. Ventura, and despite her protestations, Mr. Combs insisted on these intricately staged and forced sexual encounters between Ms. Ventura and various male sex workers.

## VI.    Ms. Ventura Tries to Escape Mr. Combs' Abuse

104.    Any time she tried to create distance between her and Mr. Combs, he used his networks to find her and convince her to return to his abuse.

105.    On multiple occasions, Mr. Combs sent his employees to lure Ms. Ventura back.

106.    In 2011, during a rough patch in Mr. Combs and Ms. Ventura's relationship, Ms. Ventura had a brief relationship with musician Kid Cudi.

107.    When Mr. Combs returned from a trip, he demanded another FO of Ms. Ventura. She acquiesced.

108.    During this FO, Mr. Combs found Ms. Ventura's phone and found emails between her and Kid Cudi.  Mr. Combs became enraged and proceeded to place a manual corkscrew between his fingers and lunged at Ms. Ventura.

109.    Ms. Ventura ran away to stay at Kid Cudi's home to escape Mr. Combs's wrath. Soon thereafter, one of Mr. Combs's staff members told Ms. Ventura that he needed "to just talk to [Mr. Combs]," even though Mr. Combs was enraged.

110.    Feeling like she could not escape Mr. Combs and his network of enforcers, Ms. Ventura returned to Mr. Combs.  He hit her several times, and then kicked her in the back as she tried to run out the door.

111.    She went to her parents' home in Connecticut where her mother took pictures of the bruises Mr. Combs had left on Ms. Ventura's body.

112.    In February 2012, during Paris Fashion Week, Mr. Combs told Ms. Ventura that he was going to blow up Kid Cudi's car, and that he wanted to ensure that Kid Cudi was home with his friends when it happened.  Around that time, Kid Cudi's car exploded in his driveway.

113.    Ms. Ventura was terrified, as she began to fully comprehend what Mr. Combs was both willing and able to do to those he believed had slighted him.

114.    In 2015, Ms. Ventura spoke to a popular music manager at an after party in a hotel suite in Las Vegas. Mr. Combs saw her speaking to this manager, and sternly told her to step into the bedroom adjoining the suite. In the bedroom, Mr. Combs beat Ms. Ventura severely. She ran from corner to corner of the room, trying to avoid Mr. Combs's beating and kicking. When she tried to lock herself in the bathroom, he pushed through, and punched and kicked her while she curled up under the toilet. Her screams were drowned out by the loud music playing in the outside area of the hotel suite.

115.    When Mr. Combs's head of security and assistant saw Ms. Ventura after the assault, they began to cry. Ms. Ventura had two black eyes, a burst and bruised lip, and a huge welt on her forehead.

116.    Upon seeing the results of his vicious attack, Mr. Combs immediately took steps to conceal his wrongdoing.

117.    He forced Ms. Ventura to stay at his home in Holmby Hills along with one of his sons. While there, Mr. Combs FaceTimed Ms. Ventura, and stated, "you gotta go up and put more makeup on, my son can't see you like that."

118.    She did put makeup on, per Mr. Combs's demands. Ms. Ventura felt that she had no choice but to obey her abuser—even though security guards, assistants, and friends saw the situation she was in, no one dared to help her or speak up on her behalf. She therefore had no choice but to remain subservient.

119.    Later in 2015, while shooting a movie in Cape Town, South Africa, Ms. Ventura began a flirtatious relationship with an actor. She spent New Years Eve with this actor, but Mr.

Combs soon found out. Mr. Combs called the actor and threatened him; the actor proceeded to call Ms. Ventura and tell her, "you really need to call [Mr. Combs]."

120. In or around March 2016, during an FO at the InterContinental Hotel in Century City, Los Angeles, Mr. Combs became extremely intoxicated and punched Ms. Ventura in the face, giving her a black eye.

121. After he fell asleep, Ms. Ventura tried to leave the hotel room, but as she exited, Mr. Combs awoke and began screaming at Ms. Ventura. He followed her into the hallway of the hotel while yelling at her. He grabbed at her, and then took glass vases in the hallway and threw them at her, causing glass to crash around them as she ran to the elevator to escape.

122. She managed to get into the elevator, and when she got to the lobby, quickly took a cab to her apartment. Upon realizing that her running away would cause Mr. Combs to be even angrier with her, and completely stuck in his vicious cycle of abuse, Ms. Ventura returned to the hotel with the intention of apologizing for running away from her abuser. When she returned, hotel security staff urged her to get back into a cab and go to her apartment, suggesting that they had seen the security footage showing Mr. Combs beating Ms. Ventura and throwing glass at her in the hotel hallway.

123. Upon information and belief, Mr. Combs paid the InterContinental Century City $50,000 for the hallway security footage from that evening.

124. After this, Ms. Ventura left her home in Comstock and went to hide away at a friend's home in Florida. James Cruz, President of Bad Boy Management, tracked Ms. Ventura down and told her that her single would not be released if she did not answer Mr. Combs's phone calls.

125.     A woman who worked at Sony Music reached out to her with a similar ultimatum concerning her record.

126.     Incredibly, Mr. Combs even convinced one of his attorneys to call Ms. Ventura at this time.  This lawyer told Ms. Ventura that "it's in your best interest to call [Mr. Combs] back."

127.     Each time Ms. Ventura tried to run away, Mr. Combs and his powerful network would force her back to him.

128.     Mr. Combs's tight hold over her life had irreparably damaged her friendships.  Around 2018, when Ms. Ventura was with her friend Kerry Morgan in her house, Mr. Combs used his key to Ms. Ventura's house and came in unannounced.  He and Ms. Morgan had an altercation, during which Mr. Combs threw a hanger at Ms. Morgan.  Upon information and belief, the incident resulted in a settlement between Mr. Combs and Ms. Morgan, and Ms. Ventura ended up paying Ms. Morgan additional funds in an attempt to resolve the dispute between her close friend and her abusive and controlling boyfriend.  The relationship between Ms. Ventura and Ms. Morgan has been strained since this time.

129.     Seeing the extreme measures Mr. Combs took to keep a tight hold on Ms. Ventura and isolate her from her support network, and having experienced the repercussions of rejecting his demands, Ms. Ventura felt that saying "no" to Mr. Combs would cost her something—her family, her friends, her career, or even her life.

## VII.    Mr. Combs Rapes Ms. Ventura

130.     By 2017 and 2018, Ms. Ventura became desperate to leave Mr. Combs and his abuse of her.  She recognized that if she stayed with him, she would never be able to have a successful career or ever be physically and mentally safe.  She therefore became determined to

completely break away from Mr. Combs and his cycle of abuse and made concerted efforts to avoid him.

131.    In September 2018, she joined Mr. Combs for a dinner at an Italian restaurant in Malibu, California for what she believed would be a discussion about concluding their relationship for good.

132.    After dinner, Mr. Combs and Ms. Ventura returned to Ms. Ventura's home, which was paid for by Mr. Combs.

133.    Mr. Combs forced himself into her apartment and tried to kiss Ms. Ventura.  She told him to stop and attempted to push him away.

134.    Mr. Combs then forcibly pulled off Ms. Ventura's clothing and unbuckled his belt. He proceeded to rape Ms. Ventura while she repeatedly said "no" and tried to push him away.

135.    Soon thereafter, Ms. Ventura took steps to completely separate herself from her long-time abuser, including by leaving the home that he paid for and returning the car he purchased for her.

136.    Despite moving away, Ms. Ventura's address was posted online in early 2019, leading to fears for her safety.

137.    Ms. Ventura, who was under immense duress during the months after Mr. Combs raped her, took all steps possible to entirely remove herself from her abuser's ambit, including by entering into contracts to end her record deal with Bad Boy Entertainment.

## VIII.   Mr. Combs's Sexual and Physical Abuse of Ms. Ventura Has Caused Her Lifelong Harm

138.    As a result of the immense trauma Ms. Ventura endured for over a decade with Mr. Combs, she has suffered and continues to suffer from immense emotional distress.

139.    Following her escape from the cycle of abuse and sex trafficking she endured, she struggled with the physical and mental manifestations of her trauma.

140.    The birth of her two children, however, allowed her a new lease on life and gave her purpose.  She credits her children with saving her from the trauma that had consumed over a decade of her life.

141.    Except for the months when she was pregnant with her children, Ms. Ventura struggled with her addictions to drugs and alcohol—addictions that were established and fueled by Mr. Combs.  She turned to substances to drown out the memories of her abuse; without being intoxicated, she suffered from horrific nightmares of the forced sexual acts that Mr. Combs demanded she participate in during the regularly scheduled FOs and of the physical beatings that she endured throughout her relationship.  She had difficulty eating or sleeping, and her relationships with her family suffered.  During this time, she frequently had thoughts of ending her life.

142.    To rebuild her life and her career, Ms. Ventura needed to completely reinvent herself.  She checked herself into inpatient treatment at a rehabilitation center, where she first confronted the extent of the trauma she lives with.  She has required intensive therapy and other medical care to recover from Mr. Combs's abuse, and she will forever live with the physical and psychological repercussions of the over a decade of violence, fear, and exploitation she endured.

143.    Although Ms. Ventura was unable to speak up against the years of abuse she endured at the hands of Mr. Combs, she has since been able to rebuild her life and confront her trauma.  Thanks to the passage of New York's Adult Survivors' Act and California's Sexual Abuse Accountability and Cover-Up Act, she is now ready and able to also confront her abuser, and to hold him and those who enabled his abuse accountable for their actions.

**FIRST CAUSE OF ACTION**
**Sex Trafficking under 18 U.S.C. § 1591, *et seq.***
***Against All Defendants***

144.    Plaintiff repeats and realleges each and every allegation in all of the preceding

paragraphs as if fully set forth herein.

145.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C.

§ 1591(a) and (b) and is therefore entitled to bring a civil action under 18 U.S.C. § 1595.

146.    The Defendants' acts and omissions, taken separately and/or together, as outlined

above, constitute a violation of 18 U.S.C. § 1595.  Specifically, Defendant Sean Combs

perpetrated sex trafficking of Ms. Ventura by requiring her to engage in forced sexual acts in

multiple jurisdictions, and all Defendants benefitted from Mr. Combs's venture by holding Ms.

Ventura, an artist signed with Defendant Bad Boy Records and otherwise employed by other

Defendant Doe Corporations, captive to Mr. Combs's demands and desires.  At all relevant times,

Defendants participated in and facilitated the harboring and transportation of Plaintiff for

purposes of sex induced by force, fraud, or coercion.

147.    The Defendant Corporations have financially and otherwise benefited as a result

of these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of the

Defendant Corporations, satisfied.  They benefited from facilitating his behavior to the extent it

kept the mercurial music mogul happy and kept Ms. Ventura obedient to Mr. Combs and the

Corporations' interests.

148.    Defendant Combs and Defendants Bad Boy Records, Bad Boy Entertainment, and

Doe Corps. 1-10 formed a venture as defined by 18 U.S.C. § 1591 given that they constituted a

"group of two or more individuals associated in fact, whether or not a legal entity."

149.    As a direct and proximate result of Defendants' unlawful conduct as alleged

hereinabove, Plaintiff has suffered physical injury, severe emotional distress and anxiety,

humiliation, embarrassment, post-traumatic stress disorder, economic harm and other

consequential damages.

150.    Plaintiff also seeks reasonable attorneys' fees as provided under 18

U.S.C. § 1595(a).

**SECOND CAUSE OF ACTION**
**Violation of The New York Services for Victims of Human Trafficking, N.Y. Servs. Law**
**§ 483-bb(c)**
***Against All Defendants***

151.    Plaintiff repeats and realleges each and every allegation in all of the preceding

paragraphs as if fully set forth herein.

152.    Plaintiff is a victim of sex trafficking within the meaning of N.Y. Penal Law §

230.34 and is therefore entitled to bring a civil action under N.Y. Soc. Serv. § 483-bb.

153.    The Defendants' acts and omissions, taken separately and/or together, as outlined

above, constitute a violation of N.Y. Soc. Serv. § 483-bb.  Specifically, Defendant Sean Combs

perpetrated sex trafficking of Ms. Ventura by requiring her to engage in forced sexual acts in the

State of New York, and all Defendants benefitted from Mr. Combs's venture by holding Ms.

Ventura, an artist signed with Defendant Bad Boy Records and otherwise employed by other

Defendant Doe Corporations, captive to Mr. Combs's demands and desires.  At all relevant times,

Defendants participated in and facilitated the harboring and transportation of Plaintiff for

purposes of sex induced by force, fraud, or coercion.

154.    The Defendant Corporations have financially and otherwise benefited as a result

of these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of the

Defendant Corporations, satisfied.  They benefited from facilitating his behavior to the extent it

27

kept the mercurial music mogul happy and kept Ms. Ventura obedient to Mr. Combs and the Corporations' interests.

155.    As a direct and proximate result of Defendants' unlawful conduct as alleged hereinabove, Plaintiff has suffered physical injury, severe emotional distress and anxiety, humiliation, embarrassment, post-traumatic stress disorder, economic harm and other consequential damages.

156.    Plaintiff also seeks reasonable attorneys' fees as provided under N.Y. Soc. Serv. § 483-bb.

### THIRD CAUSE OF ACTION
### Violation of The California Trafficking Victims Protection Act, Cal. Civil Code § 52.5
### *Against All Defendants*

157.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

158.    Plaintiff is a victim of sex trafficking within the meaning of Cal. Penal Code § 236.1 and is therefore entitled to bring a civil action under Cal. Civil Code § 52.5.

159.    The Defendants' acts and omissions, taken separately and/or together, as outlined above, constitute a violation of Cal. Civ. Code 52.5. Specifically, Defendant Sean Combs perpetrated sex trafficking of Ms. Ventura by requiring her to engage in forced sexual acts in the State of California, and all Defendants benefitted from Mr. Combs's venture by holding Ms. Ventura, an artist signed with Defendant Bad Boy Records and otherwise employed by other Defendant Doe Corporations, captive to Mr. Combs's demands and desires. At all relevant times, Defendants participated in and facilitated the harboring and transportation of Plaintiff for purposes of sex induced by force, fraud, or coercion.

160.    The Defendant Corporations have financially and otherwise benefited as a result

of these acts and omissions by keeping Mr. Combs, the volatile and explosive owner of the

Defendant Corporations, satisfied.  They benefited from facilitating his behavior to the extent it

kept the mercurial music mogul happy and kept Ms. Ventura obedient to Mr. Combs and the

Corporations' interests.

161.    As a direct and proximate result of Defendants' unlawful conduct as alleged

hereinabove, Plaintiff has suffered physical injury, severe emotional distress and anxiety,

humiliation, embarrassment, post-traumatic stress disorder, economic harm and other

consequential damages.

162.    Plaintiff also seeks reasonable attorneys' fees as provided under Cal. Civil Code

§ 52.5.

## FOURTH CAUSE OF ACTION
### Battery/Sexual Battery Under New York Law
#### *Against Defendant Sean Combs*

163.    Plaintiff repeats and realleges each and every allegation in all of the preceding

paragraphs as if fully set forth herein.

164.    In performing the conduct described above, Defendant committed a battery

against Plaintiff because he intentionally engaged in unlawful, intentional, and offensive

touching or application of force to Plaintiff's person.  Defendant's actions amount to violations

under N.Y. Penal Law §§ 130.50, 130.52, 130.55, and 130.65, as well as analogous California

law and the common law of New York and California.

165.    As a result of Mr. Combs's alleged conduct, Plaintiff has suffered physical injury,

severe emotional distress, humiliation, embarrassment, anxiety, economic harm, and other

consequential damages.

166.     The conduct of Mr. Combs described above was willful, wanton, and malicious. At all relevant times, Mr. Combs acted with conscious disregard of Plaintiff's rights and feelings, acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to Plaintiff, and intended to cause fear, physical injury, and/or pain and suffering to Plaintiff.  By virtue of the foregoing, Plaintiff is entitled to recover punitive and exemplary damages from Mr. Combs according to proof at trial.

167.     This action is timely because it falls within CPLR § 214-j and is brought during the one-year time period set forth in that section.  The claims brought herein allege intentional and negligent acts and/or omissions for physical, psychological, and other injury suffered as a result of conduct that would constitute sexual offenses as defined in Article 130 of the New York Penal Law, and such acts and/or omissions were committed against Ms. Ventura when she was over eighteen years of age.  The action also falls within California's Adult Sexual Abuse Law and is brought during the three-year time period set forth in that action.

### FIFTH CAUSE OF ACTION
**Sexual Assault pursuant to The California Sexual Abuse and Cover Up Accountability Act, Cal. Civ. Proc. § 340.16**
*Against All Defendants*

168.     Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

169.     Defendant Mr. Combs subjected Plaintiff to sexual abuse, sexual battery, rape, and forcible act of sexual penetration, as defined in Cal. Penal Code §§ 234.4, 261, and 289.  In doing so, he intended to and did cause harmful and sexually offensive contact with their person and place them in imminent apprehension of such contact.

170.     Defendant Corporations were entities engaged in a "cover up" as defined in Cal. Civil Code § 340.16(4)(A), because Defendant Corporations took concerted efforts to hide

evidence relating to the above-described sexual assaults that incentivized individuals to remain

silent or prevented information relating to the sexual assaults from becoming public."

171.    As a direct and proximate result of Defendants' unlawful conduct as alleged

hereinabove, Plaintiff has suffered physical injury, severe emotional distress and anxiety,

humiliation, embarrassment, post-traumatic stress disorder, economic harm and other

consequential damages.

## SIXTH CAUSE OF ACTION
### Violation of the Victims of Gender-Motivated Violence Act, N.Y.C. Admin. Code §§ 10-1101, *et seq.* ("VGMVPL")
### *Against All Defendants*

172.    Plaintiff repeats and realleges each and every allegation in all of the preceding

paragraphs as if fully set forth herein.

173.    The above-described conduct of Defendant Mr. Combs, including, but not limited

to, Mr. Combs's repeated physical and sexual assaults of Plaintiff in New York City, constitutes a

"crime of violence" and a "crime of violence motivated by gender" against Plaintiff as defined

by the New York City VGMVPL.

174.    The above-described conduct of Defendant Mr. Combs, including, but not limited

to, Mr. Combs's repeated physical and sexual assaults of Plaintiff in New York City, constitutes a

"crime of violence" against Plaintiff and is a "crime of violence motivated by gender" as defined

in § 10-1103 ("The term 'crime of violence' means an act or series of acts that would constitute a

misdemeanor or felony against the person as defined in state or federal law or that would

constitute a misdemeanor or felony against property as defined in state or federal law if the

conduct presents a serious risk of physical injury to another, whether or not those acts have

actually resulted in criminal charges, prosecution, or conviction," and "The term 'crime of

violence motivated by gender' means a crime of violence committed because of gender or on the basis of gender, and due, at least in part, to an animus based on the victim's gender.").

175.    Defendant Corporations enabled Mr. Combs's commission of the crime of violence motivated by gender, and are therefore also liable under the VGMVPL.

176.    As a direct and proximate result of the aforementioned crime of violence and gender-motivated violence, Plaintiff has sustained and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory and punitive damages, injunctive and declaratory relief, attorneys fees and costs, and other remedies as this Court may deem appropriate damages, as set forth in § 10-1104.

177.    The above-described conduct of Defendant Mr. Combs constitutes a sexual offense as defined in Article 130 of the New York Penal Law.

178.    Pursuant to § 10-1105(a), this cause of action is timely because it is commenced within "two years and six months after September 1, 2022."

### SEVENTH CAUSE OF ACTION
**Sexual Harassment, Gender Discrimination, and Hostile Work Environment under New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYSHRL")**
***Against All Defendants***

179.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

180.    Defendants discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by subjecting Plaintiff to disparate treatment based upon her gender, including, but not limited to, subjecting her to sexual assault and/or harassment, rape and a hostile work environment.

181.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

182.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

183.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

184.    This action is timely because it falls within CPLR § 214-j and is brought during the one-year time period set forth in that section.  The claims brought herein allege intentional and negligent acts and/or omissions for physical, psychological, and other injury suffered as a result of conduct that would constitute sexual offenses as defined in Article 130 of the New York Penal Law, and such acts and/or omissions were committed against Ms. Ventura when she was over eighteen years of age.

## EIGHTH CAUSE OF ACTION
### Sexual Harassment, Gender Discrimination, and Hostile Work Environment under New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.* ("NYCHRL") *Against All Defendants*

185.    Plaintiff repeats and realleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

186.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by subjecting Plaintiff to disparate treatment based upon her gender,

including, but not limited to, subjecting her to sexual assault and/or harassment, rape and a hostile work environment.

187.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

188.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

189.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

190.    This action is timely because it falls within CPLR § 214-j and is brought during the one-year time period set forth in that section.  The claims brought herein allege intentional and negligent acts and/or omissions for physical, psychological, and other injury suffered as a result of conduct that would constitute sexual offenses as defined in Article 130 of the New York Penal Law, and such acts and/or omissions were committed against Ms. Ventura when she was over eighteen years of age.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays judgment be entered in her favor against Defendants, and each of them, as follows:

1.      For a money judgment representing compensatory damages including consequential damages, lost wages, earning, and all other sums of money, together with interest on these amounts, according to proof;

2.      For a money judgment for mental pain and anguish and severe emotional distress, according to proof;

3.      For punitive and exemplary damages according to proof;

4.      For attorneys' fees and costs;

5.      For prejudgment and post-judgment interest; and

6.      For such other and further relief as the Court may deem just and proper.


Dated: November 16, 2023
       New York, New York

                                   Respectfully submitted,

                                   **WIGDOR LLP**


                                   By: _____
                                        Douglas H. Wigdor
                                        Meredith A. Firetog
                                        Michael J. Willemin

                                   85 Fifth Avenue
                                   New York, New York 10003
                                   Telephone: (212) 257-6800
                                   Facsimile: (212) 257-6845
                                   dwigdor@wigdorlaw.com
                                   mfiretog@wigdorlaw.com
                                   mwillemin@wigdorlaw.com



D. Liens
Dignity of
&  uses
Genause
Delivery
390 9th Ave
NY NY
10001

Adult Survivors Act
Filing

TO

Judge
US Dist Court
Southern District
of NY
500 Pearl Street
NY, NY 10001